UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

KIM LEE MILLBROOK,
   Plaintiff,

vs.                                                                 No. 07-4023

JAMES J. COSBY, et.al.,
   Defendants

SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the parties motions for summary judgement. [ 85, 87, 88, 95]

I. BACKGROUND

The pro se plaintiff filed his lawsuit pursuant to 42 U.S.C. §1983 against defendants at the Henry County Jail. The plaintiff has the following surviving claim against Defendants Sheriff Cady, Jail Administrator Streight, Dr. Stephen Cullinan and Nurse Cheyenne Cassini:

1) Defendants Cady and Streight violated the plaintiff's due process rights when the plaintiff was placed in a suicide cell for a month without a hearing and without cause;
2) Defendants Cady and Streight violated the plaintiff's Fourteenth Amendment rights based on his cell conditions in segregation during a two month period;
3) Defendants Dr. Cullinan and Nurse Cassini were deliberately indifferent to the plaintiff's serious medical conditions;
4) Defendant Streight violated the plaintiff's due process rights based on inhumane living conditions; and,
5) Defendant Streight violated the plaintiff's due process rights based on his placement in administrative lockdown.[1]

The plaintiff has filed a document entitled "Motion to Defendants' Motion For Summary Judgement and Plaintiff's Motion (Against Defendants) for Summary Judgement." [d/e 94, 95] The plaintiff has not followed the guidelines for filing a summary judgement motion, and instead, this appears to be a response to the defendants' dispositive motion. Therefore, the court will consider this document only as an Response to the defendants motions.[2]

Defendants Cassini and Cullinan have filed a motion for summary judgement [d/e 85] and a

---

[1] The court notes the plaintiff's claims originated in two separate lawsuits, *Millbrook v Cady*, Case No. 07-4023 and *Millbrook v. Cosby*, Case No. 08-4004. On February 29, 2008, the court consolidated the claims into this one lead lawsuit.

[2] For clarification of the record, the court notes that documents 94 and 95 are copies of the same document. In addition, documents 102 and 103 are also copies of the same document.

1

motion to supplement this dispositive motion. [d/e 87]. The motion to supplement is granted.

## II. FACTS

Pursuant to an agreement between the U.S. Marshall's Service and Henry County, the plaintiff was held as a federal detainee in the Henry County Jail from September 13, 2006 to August 13, 2007. (Def. Memo, Str. Aff, p. 1). The plaintiff was a pretrial detainee at the time of the events in his complaint.

Gilbert Cady is the Henry County Sheriff. Robert Streight is a Henry County Sheriff's Deputy who works as the jail administrator. Cady says he has delegated responsibility for the day-to-day operation of the jail to Streight. (Def. Memo, Cady Aff, p. 1) Streight says he reviews and approves any decision to place a detainee in administrative segregation or on lockdown status. (Def. Memo, Str. Aff, p. 1). Sheriff Cady says he is not involved in these decisions and was not involved in the placement of the plaintiff while he was in the jail. (Def. Memo, Cady Aff, p. 1) Further, Cady says he does not review grievances from detainees and is not aware of grievances filed by the plaintiff. (Def. Memo, Cady Aff, p. 2)

The Henry County jail has six cellblocks designated as B, D, G, H, I and J. Each cellblock consists of seven two-person cells which open into a dayroom that has a shower. Detainees are generally able to use the dayroom during the day until 10:30 p.m. when they are locked in their cells for the night. (Def. Memo, Str. Aff, p. 2)

The jail also has three holding cells: A, B and C. Each holding cell has a sink with hot and cold water and a toilet. Hold cell A is used to temporarily hold detainees going to and from court appearances. Holding Cell B is for attorney/detainee conferences and Holding C is used for suicide watch since it can be viewed by guards and is directly across from the control room. (Def. Memo, Str. Aff, p. 2).

When the plaintiff entered the jail on September 13, 2006, he was placed in general population, Cellblock B. However, on September 18, 2006 Deputy Hixon observed the plaintiff fighting with another detainee in Cellblock B. When deputies separated the two, the plaintiff asked to see a nurse and the other inmate refused care.(Def. Memo, Str. Aff, Ex. 2)

Jail Administrator Streight says when two detainees get into an altercation, the jail has a policy of separating the individuals to prevent any further disruption and protect the safety of the detainees as well as staff. Depending on the circumstances of the altercation, a detainee can either be put on lockdown within his cell, moved to a holding cell and placed in administrative segregation or moved to a different cellblock. (Def. Memo, Str. Aff, p. 3).

As a result of the plaintiff's fight with another detainee on September 18, 2006, Streight says the plaintiff was placed in administrative segregation and moved to holding cell C to separate the plaintiff from the other detainee and give them both time to calm down. (Def. Memo, Str. Aff, p. 3). The plaintiff was moved back to general population in Cellblock H on September 21, 2006.

(Def. Memo, Str. Aff, p. 3)

On October 14, 2006, a detainee reported to Deputy Newman that he had an altercation with the plaintiff on October 13, 2006 and the plaintiff had injured him. (Def. Memo, Str. Aff, p. 3. Ex. 11) Deputy Newman investigated the claim, and during this investigation the plaintiff was placed on lockdown. On October 18, 2006, the plaintiff told Deputy Gearbart that the and another detainee in Cellblock H were going to fight. As a result of these incidents, the plaintiff was moved to administrative segregation in a holding cell. Defendant Streight says this action was intended to separate the plaintiff from the detainees he was having disagreements with and give him a chance to get his emotions under control. (Def. Memo, Str. Aff, p. 4) On October 26, 2006, the plaintiff was moved back to the general population, but this time in Cellblock J.

On January 1, 2007, the emergency button in Cellblock J went off and Deputy Haars responded to find one detainee on the floor and the plaintiff on top of him. (Def. Memo, Str. Aff, p. 4, Ex. 4) Deputy Haars investigated the incident and during the investigation the plaintiff was placed on lockdown in Cellblock J. On this same day, another inmate reported that he had problems with the plaintiff and claimed the plaintiff had struck him several times. (Def. Memo, Vanhyning Aff. P. 2) Deputy Vanhyning investigated and took statements from witnesses. (Def. Memo, Str. Aff, p. 4)

As of January 1, 2007, Jail Administrator Streight says the plaintiff had been involved in fights in each of the three general population cellblocks he had been assigned.

> In each of the three cellblocks, other prisoners claimed that Millbrook had instigated the altercations and had threatened other prisoners. Without attempting to determine fault with respect to each of theses incidents, it was my judgement that to prevent further disruption and for the protection of Millbrook an other detainees in the cellblocks, Millbrook could not be returned to these three cellblocks and needed to be separated from other detainees until he had control of his emotions. (Def. Memo, Str. Aff, p. 5)

The plaintiff filed a grievance on January 3, 2007 complaining about his placement in administrative segregation. The Jail Administrator responded:

> After reviewing your statements and complaint and those of other individuals involved and reports, I think it is best that you remain in administrative segregation until you can control your emotions when in population. We have talked before and you do fine when you are alone. I think the everyday annoyances of the other people in the blocks fuel your reactions. I know you realize this is a reoccurring problem and if you have any ideas on how it can be rectified we would like to hear them. (Def. Memo, Str. Aff, p. 5)

3

Jail Administrator Streight says it was not his intention that the plaintiff stay in administrative segregation undefinedly. Instead he said the plaintiff's return to general population would depend on: 1) the availability of room in the cellblocks were the plaintiff had not had difficulties; and 2) a commitment from the plaintiff that he would try to get along with other detainees in the general population. (Def. Memo, Str. Aff, p. 5-6)

Streight says on two occasions when a cell was available, he talked to the plaintiff and asked if he was ready to return to the general population. On both occasions, the plaintiff said he would prefer to stay in administrative segregation. (Def. Memo, Str. Aff, p. 6). The plaintiff denies this and the defendants have offered no documentation in support of this claim.

On February 1, 2007, the plaintiff was moved from administrative segregation to Holding Cell C because they needed room in the administrative segregation cell for another inmate. Streight says the plaintiff was not placed in this cell because of a fear he would harm himself or because he was on suicide watch. (Def. Memo, Str. Aff, p. 6)

The plaintiff was returned to the general population in Cellblock G on February 23, 2007. However, on March 16, 2007, the plaintiff was moved to general population in Cellblock D because of a report that the plaintiff was not getting along with two other detainees. (Def. Memo, Str. Aff, p. 6)

On March 20, 2007, Corporal Lessard received a report that the plaintiff had been involved in a fight with two other detainees in Cellblock D. A detainee claimed that the plaintiff had struck him in the head. (Def. Memo, Hixson Aff., p. 2) Lessard investigated and took statements from those involved and witnesses. Lessard then ordered the plaintiff to be put on lockdown in Cellblock D. (Def. Memo, Str. Aff, p. 6-7)

Jail Administrator Streight says it was at this point that he ordered that the plaintiff was to remain on lockdown during the remainder of his stay in the Henry County Jail. Streight says the plaintiff had demonstrated that he was not able to avoid confrontations when he came into contact with other detainees and had been involved in altercations in five of the general population cellblocks he was assigned.

> It was my judgement that it was necessary to put (the plaintiff) on
> permanent lockdown in order to avoid further disruption and to
> avoid likely confrontation with other detainees. (Def. Memo, Str.
> Aff, p. 7)

The plaintiff therefore remained on lockdown from March 20, 2007, until his transfer out of the jail on August 13, 2007 with the exception of those times he was temporarily moved for court hearings. (Def. Memo, Str. Aff, p. 7).

Streight says the cell used for administrative lockdown was 7 feet wide and 10 feet deep. The holding cells used for administrative segregation are either 6 feet wide and 9.4 feet deep or 9

feet wide and 15 feet deep. Streight says any of these cells offer plenty of room for exercise. (Def. Memo, Str. Aff, p. 7) The cells have hot water, heat, air condition and an overhead light that remains on until 10:30 p.m.

Streight says detainees in administrative segregation are offered the opportunity to take a shower once a day. Detainees are also allowed an hour of exercise outside, or depending on the weather, in the dayroom. This usually occurred on first shift, but could also take place on second shift depending on the workload. (Def. Memo, Str. Aff, p. 8) Streight says he does not monitor these trips, but instead the responsibility is delegated to the shift officers. However, Streight says he did not receive any complaints from the plaintiff that officers were not offering him showers and exercise time. Deputies Haars, Lessard and Vanhyning and Corporal Dynes say the plaintiff usually took the opportunity to take a shower or for exercise time, and they can only remember one occasion when the plaintiff turned down the opportunity. (Def. Memo, Haars Aff, p. 2, Van Aff, p. 3, Less. Aff, p. 2, Dynes Aff. P. 3)

Streight says detainees on administrative lockdown are allowed to use the dayroom for one hour after nighttime lockdown at approximately 10:30 p.m. Again, those duties are delegated to shift officers. Streight says he did not receive any complaints from the plaintiff that he had been denied this time in the day room. (Def. Memo, Str. Aff, p. 8-9) Deputies Haars, Lessard and Deputy Vanhyning and Corporal Dynes say the plaintiff usually took advantage of the opportunity to be in the dayroom, but on a few occasions chose to remain in his cell after it was unlocked. (Def. Memo, Haars Aff, p. 3, Van Aff. p. 3, Less. Aff, p. 2, Dynes Aff. P. 3))

Streight says the heat and air condition in the jail is maintained and controlled by the county and any complaints are sent to Henry County employee, Jerry Shannon. However, Streight notes that if an administrative segregation cell was without heat, officers would know immediately because there would also be no heat in the Jail Administrator's office or the booking room. Streight says he is not aware of any occasion when these areas went without heat in 2007. (Def. Memo, Str. Aff, p. 9)

Jerry Shannon says he is the Henry County employee responsible for maintaining county buildings including the jail. His responsibilities include maintaining the jail's heating, air condition and water systems. Shannon says the heat is maintained at 70 degrees for all areas in the jail. Shannon says he is "unaware of any malfunctions in the jail's heating system in 2007." (Def. Memo, Shan. Aff, p. 2)

Shannon says all showers and faucets in the jail are served by the same water system. However, hot water may be available immediately in some areas and others may have to wait due to the distance the water travels. Shannon says routine maintenance is performed to keep the water system operating properly. (Def. Memo, Shan. Aff, p. 2-3)

Detainees are also provided with a blanket, clothing and bedding when they arrive at the jail and an extra blanket is issued in the winter months. (Def. Memo, Str. Aff, p. 9) Detainees are also provided a toothbrush, toothpaste and soap when they first arrive at the jail. However, from

then on, all nonindigent inmates are responsible for purchasing their own hygiene items from the commissary. (Def. Memo, Str. Aff, p. 10)    Streight says Millbrook had funds in his account throughout his stay and was not indigent. (Def. Memo, Str. Aff, p. 10)

Further, Streight says each holding cell has hot water.  If hot water were not available, officers would immediately know because they also would not have hot water.  Streight says he is aware of no occasion when the jail went without hot water in 2007. (Def. Memo, Str. Aff, p. 10). Streight also notes that the plaintiff purchased food items from the commissary that required hot water before they were eaten. (Def. Memo, Str. Aff, p. 11)

Dr. Stephen Cullinan says he is the Chief Medical Officer and co-founder of Health Professionals, Ltd.   Dr. Cullinan says he also serves as Medical Director or staff physician for a number of Midwest county jails including the Henry County Jail. (Def. Memo, Cull. Aff, p. 1). Cheyenne Cassini is a nurse who is responsible for upkeep of medical records at the Henry County Jail.  Dr. Elyea says he is employed by Health Professionals as a peer review physician and to provide medical services to inmates. (Def. Memo, Elyea Aff., p. 1)

Cassini says she first saw the plaintiff on September 14, 2006.  The plaintiff complained of a head injury from an altercation at the Tazewell County Jail earlier that month.  The plaintiff said he had blind spots in his vision and also complained of pain in his left hand.  Further, the plaintiff said he had a rash on the back of his neck.  (Def. Memo, Cass. Aff, p 1-2).  Cassini asked the plaintiff to sign a release so she could obtain his previous medical records regarding his injuries. She cleaned the effected area and applied antibiotic ointment.   The plaintiff was also given Ibuprofen and scheduled for a follow-up appointment with the doctor. (Def. Memo, Cass. Aff, p 2)

Dr. Cullinan says he first examined the plaintiff on September 17, 2006.  The plaintiff said he fell one week earlier and was complaining of blurred vision.  The doctor examined the plaintiff, but the only diagnosis was keratosis pilaris.   The plaintiff was provided a prescription. (Def. Memo, Cull. Aff, p 2)

Dr. Cullinan says the common symptoms of keratosis pilaris include small rough bumps on the skin that resemble goose bumps.

> keratosis pilaris is unsightly but completely harmless.  The skin feels rough or spiky as though the skin has permanent goose bumps.  Occasionally keratosis pilaris is itchy.   Keratosis pilaris appears when extra keratin accumulates in the hair follicles.  There is no cure for keratosis pilaris since it is a chronic follicular disease.  However, treatments are available.  (Def. Memo, Cull. Aff, p 2).

The plaintiff was also seen by medical staff on September 18, 2006, when he complained that he had injured a finger in a fight.  The plaintiff was treated and scheduled for a follow-up appointment.  The plaintiff returned on September 26, 2006 and his finger had improved.  The plaintiff was given a three day supply of Tylenol for his complaint of headaches. (Def. Memo, Cass. Aff, p 2).

6

The plaintiff was seen by medical staff again on November 2, 2006, when he complained of a sore throat and rash. The plaintiff was given a two day supply of Tylenol and told to return if he condition worsened. (Def. Memo, Cass. Aff, p 2-3) The plaintiff returned on November 5, 2006, and complained of bumps on the back of his neck and itching. Nurse Cassini noted the plaintiff had lesions and scabs on the back of his neck. A review of the plaintiff's previous medical record indicated that Keflex had been used for a similar complaint in the past. Nurse Cassini says she called Dr. Cullinan and he approved a prescription for Keflex.

The plaintiff saw medical staff again on December 26, 2006. The plaintiff said the rash on the back of his neck caused intermittent itching and sores. The plaintiff was given a two week supply of Motrin.

Nurse Cassini saw the plaintiff next on January 9, 2007. The plaintiff requested Keflex for the back of his neck. The plaintiff was seen by Dr. Cullinan later the same day. The plaintiff again complained of lesions on his scalp and said Keflex helped his condition. The doctor accessed the plaintiff's situation as non-specific scalp lesions and prescribed Keflex. (Def. Memo, Cull. Aff, p 2-3).

On January 30, 2007, the plaintiff returned to the medical department and said he still had a rash on his neck. The plaintiff reported that the pumps on his skin had been bleeding, but denied scratching the area. Medical staff observed scabs on the plaintiff's neck. The plaintiff was advised to followup with Dr. Cullinan. The plaintiff saw the doctor on February 1, 2007 and he prescribed Prednisone and Inderal for the plaintiff's condition. (Def. Memo, Cull. Aff, p 3).

Nurse Cassini saw the plaintiff again on February 26, 2007 when he complained of a cut finger. The cut was cleaned and ointment was applied. (Def. Memo, Cass. Aff, p 3). The plaintiff was also seen for a scratch behind his ear on March 22, 2007. The plaintiff was told to keep the area clean. (Def. Memo, Cass. Aff, p 4)

The medical records demonstrate the plaintiff was seen for a psychiatric screen on March 9, 2006. The record noted that the plaintiff was clam and his train of thought was easy to follow. There is no evidence the plaintiff was ever maniac or depressed. (Def. Memo, Cass. Aff, p 4) No referral was made.

On April 3, 2007, the plaintiff complained of back pain. The plaintiff said his bed did not provide enough support and he put his mat on the floor to sleep. He further stated he had fallen a couple of years prior and had pain ever since. (Def. Memo, Cass. Aff, p 4)

On April 19, 2007, the plaintiff complained he had been bitten by something. Medical staff observed two millimeter scabs on his forearm, but no redness or inflammation. The plaintiff was escorted out of the medical unit after nurse Cassini says he made comments about her appearance. (Def. Memo, Cass. Aff, p 4).

On May 3, 2007, the plaintiff was examined by Dr. Elyea and complained of a rash on the

back of his scalp that he had for six to seven months.  Dr. Elyea observed follicular lesions on the plaintiff's scamp and numerous "papules" on his arms and trunk.   Dr. Elyea diagnosed the plaintiff with either keratosis pilaris or folliculitis barbae. (Def. Memo, Elyea Aff, p. 3)  Dr. Elyea says follliculitis barbae includes conditions that "look like acne with puss filled infections that look like pimples."  (Def. Memo, Elyea Aff, p. 2).   The doctor prescribed medication for the plaintiff that is used to relieve itchy skin.

Dr. Cullinan says he next saw the plaintiff on June 21, 2007 when the plaintiff complained of lesions on the back of his neck.  Dr. Cullinan assessed that the plaintiff continued to suffer from keratosis pilaris and prescribed a topical ointment.  (Def. Memo, Cull. Aff, p 3).

Dr. Cullinan and Nurse Cassini say the plaintiff did not complain of being manic or depressed or that he ever stated he needed medication for a bipolar condition.(Def. Memo, Cull. Aff, p 3); (Def. Memo, Cass. Aff, p 4-5)  "The records do not reflect the plaintiff ever showed any symptoms of any type of mood disorder."  (Def. Memo, Cull. Aff, p 3).

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c.  Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000).  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

IV.  ANALYSIS

A. DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION.

Defendants Dr. Cullinan and Nurse Cassini argue that the plaintiff cannot demonstrate that they violated his constitutional rights.   Eighth Amendment protections are extended to pretrial detainees through the Fourteenth Amendment. *Chapman v Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated these rights. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*.

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42)  Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987).

In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).  Deliberate indifference is "something approaching a total unconcern for [the plaintiffs'] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v Lane,* 959 F.2d 673, 677 (7th Cir. 1992).

It is not entirely clear based on the record before the court whether the plaintiff could demonstrate that he suffered from a serious medical condition while at the Henry County Jail. *Roberts v. Peters* 1997 WL 657016 at 1) (7th Cir. Oct. 16, 1997 )("debatable" whether skin rash is a serious medical condition.) However, the court need not address this issue because the plaintiff has failed to demonstrate that these defendants were deliberately indifferent to his medical condition.

The record before the court demonstrates that the plaintiff was repeatedly seen by medical staff when he complained of his skin condition and was provided treatment for that condition.   However, the plaintiff claims he was never correctly diagnosed by Dr. Cullinan. The plaintiff says he was not appropriately diagnosed with keratosis pilaris and "cured" until he was moved to a correctional facility in Indiana and was provided the appropriate medication. (Plain Resp, d/e 94, p. 4, 20)

The medical records belie the plaintiff's claim and demonstrate that keratosis pilaris was the same diagnosis of several medical providers at the Henry County Jail.  The plaintiff then claims

his medical records have been altered, but provides absolutely no evidence of this claim beyond his bare accusation. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995) ("Conclusory allegations by the party opposing the motion cannot defeat the motion."). In addition, "dissatisfaction with a doctor's chosen course of treatment-even when that course was negligent-is insufficient to establish deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Johnson v. Doughty*, 433 F.3d 1001, 1012-13 (7th Cir.2006).

The plaintiff also claims that he still suffers from "some pain on back of neck, possibly due to nerve ending damage from prolonged non-treatment of rash, bump, sore condition on back of neck..." (Plain. Resp, d/e 94, p. 13). The plaintiff has proffered no medical evidence to support that claim even though he is clearly receiving medical treatment from providers outside of the Henry County Jail. The only basis of this claim is the plaintiff's own uneducated guess. *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir.1999) (statements outside affiant's personal knowledge or statements based on speculation or conjecture will not defeat summary judgment motion).

The court notes that the plaintiff also makes arguments concerning a lack of appropriate care for a mood disorder, a smashed finger and a nasal condition. (Plain Resp, d/e 94, p. 10) These issues are not before the court. *See* June 25, 2007 Case Management Order.

The plaintiff has provided no evidence that Dr. Cullinan's diagnosis and chosen course of treatment were so far afield of accepted professional standards as to raise an inference of deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir.2006). In addition, the plaintiff has submitted no evidence that would allow a reasonable fact-finder to infer that either Dr. Cullinan or Nurse Cassini's decisions were based on anything other than medical judgment. The motion for summary judgement on Claim #3 is granted.

B. DUE PROCESS/ ADMINISTRATIVE SEGREGATION/ SUICIDE CELL.

The defendants argue that the plaintiff cannot demonstrate that they violated his constitutional rights when he was moved to administrative lockdown without a hearing. Due process requires that a pretrial detainee receives notice and an opportunity to be heard before he is placed in segregation as a punishment for a disciplinary infraction. *Rapier v. Harris*, 172 F.3d 999, 1004-05 (7th Cir.1999) However, no process is required if the detainee is placed in segregation not as punishment, but for a managerial reason. *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir.2002); *Bell v. Wolfish*, 441 U.S. 520 (1979); *Rapier*, 172 F.3d at 1002-06.

> [a] purely administrative reason for placing a pretrial detainee into segregation may be 'to protect jail staff from [the detainee's] violent propensities.' This action would likely be viewed as 'preventative' rather than 'punitive.' *Wilson v. Collins*, 2006 WL 2358794 at 4 (S.D.Ill. Aug. 15, 2006) *quoting Higgs*, 286 F.3d at 438. (*other citations omitted*).

In fact, "a jail's failure to take steps to prevent harm to the prisoner or to other prisoners might give rise to meritorious suits against the jail." *Higgs v. Carver*, 286 F.3d at 438. In other words,

"[t]he government may take measures that are reasonably calculated to effectuate the pretrial detention" in order "to manage the facility" and to "maintain security and order." *Rapier*, 172 F.3d at 1003.

Defendants Streight says the plaintiff's placement in restricted confinement was not punitive, but was strictly a preventative attempt to stop further confrontations between the plaintiff and other detainees. The record before the court shows the following cell placements for the plaintiff during his stay in the Henry County Jail:

| | |
|---|---|
| Sept. 13, 2006: | enters jail, placed in general population, Cellblock B. |
| Sept. 18, 2006: | deputies observe plaintiff in fight with another detainee, placed in holding cell C. |
| Sept. 21, 2006: | moved back to general population, Cellblock H. |
| Oct. 14, 2006: | plaintiff in fight with another detainee, placed on lockdown |
| Oct. 18, 1006: | plaintiff says he is going to get into altercation with another inmate, moved to a holding cell. |
| Oct. 26, 2006: | moved to general population, Cellblock J. |
| Jan. 1, 2007: | plaintiff in fight with another detainee and other detainees accuse the plaintiff of also striking them. Plaintiff placed in administrative segregation. (The is a dispute between the parties as to whether the plaintiff asked to stay in this cell). |
| Feb. 1, 2007: | moved to holding cell C (suicide watch cell), due to need for administrative segregation cell for another inmate. |
| Feb. 23, 2007: | moved to general population, Cellblock G. |
| Mar. 16, 2007: | reports that plaintiff not getting along with other detainees in Cellblock G, moved to general population in Cellblock D. |
| Mar. 28, 2007: | plaintiff in a fight with another inmate, placed on lockdown |
| Aug. 13, 2007 | plaintiff transferred out of jail. |

The plaintiff does not dispute this record in his response to the summary judgement motion. In addition, the plaintiff does not dispute the January 3, 2007 memo he received from Defendant Streight offering to listen to any ideas the plaintiff had about improving his ability to get along with other detainees.

The record before the court demonstrates the plaintiff repeatedly had problems getting along with other detainees and repeatedly got into physical altercations with other detainees. In addition, other detainees claimed that the plaintiff had assaulted them. The jail administrator could not ignore these incidents and insure the safety of the plaintiff or others in the jail.

Nonetheless, the jail administrator repeatedly gave the plaintiff chances to remain in the general population by moving him to different locations in the jail. The plaintiff was housed in five of the six general population cellhouses available, but had problems with other inmates in each location.

In addition, the defendants have demonstrated that the plaintiff was not placed in a suicide cell because of any threats that he might harm himself. The defendants placed the plaintiff in the cell when they ran out of room in the other holing cells. This is also a valid, non-punitive reason for placement that did not require a hearing. *See Higgs*, 286 F.3d at 438. ( if detainee is placed in the only vacant cell left in the jail and it is on the segregation ward, it would be a managerial decision.).

Defendant Streight had a non-punitive, managerial reason for each of the plaintiff's moves while in the Henry County Jail. The motion for summary judgement on this claims #1 and #5 is granted.

C. DUE PROCESS/ LIVING CONDITIONS.

The defendants argue that the plaintiff has failed to show his living conditions in the Henry County Jail violated his rights. The Constitution imposes upon jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes the obligation to "ensure that inmates receive adequate food, clothing, shelter, protection, and medical care." *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir.1996). However, to rise to the level of a constitutional violaition, a plaintiff must demonstrate both an objective and subjective component. *Henderson* 196 F.3d at 845.

To satisfy the objective component, a plaintiff must show that the deprivation alleged is "objectively, sufficiently serious." *Id. citing Farmer,* 511 U.S at 834. Specifically, the plaintiff must show that "the prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9(1992).

"The subjective component requires the detainee allege that the jail officials knew of a substantial risk of serious injury to the detainee but nevertheless failed to take reasonable measures to prevent that harm from occurring." *Henderson* 196 F.3d at 845; *see also Payne for Hicks v. Churchich,* 161 F.3d 1030, 1041 (7th Cir.1998). "[A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

The plaintiff's current case is a combination of two complaints. *See* February 29, 2008 Case Management and Merit Review Order. In his first complaint filed in *Millbrook v Cady*, Case No. 07-4023, the plaintiff alleged that he was placed in segregation on January 1, 2007 and the "living conditions were inhumane, no heat, no hot water and light in cell on 24/7. Not let out to get exercise or shower." (Comp, p. 4) (fed 28 too) In the second complaint filed in *Millbrook v. Cosby*, Case No. 08-4004, the plaintiff complained that he was placed in a suicide watch cell for two

12

months and was "denied toothpaste and had no hot water or heat" as well as no recreation or fresh air." (Comp, p. 3). This was the entire extent of the plaintiff's claims concerning living conditions.

The plaintiff's response is somewhat difficult to decipher because he makes little distinction between the various places he was housed at the Henry County Jail. The plaintiff makes several blanket claims including that he was denied "adequate heating, hot water, showers, recreation, exercise, due process, blankets, basic hygiene needs...." (Resp, d/e 102, p. 6(d)). The plaintiff also claims he was denied medical care and that the jail was filthy. By the court's count, the plaintiff was housed in at least six different locations in the Henry County Jail. It is possible the plaintiff is alleging that the entire jail offered inhumane living conditions.

It is somewhat doubtful the plaintiff could prove his claims. For instance, the defendants have provided evidence that the heat, air conditioning and water was the same for all detainees and jail workers, yet there is no record of any problems during this time frame for any other detainee or employee. In addition, the plaintiff has provided no evidence that he was unable to afford hygiene items. In his response to the motion for summary judgement, the plaintiff states that since the U.S. Marshal Service was paying Henry County to house him, the county should have paid for things like soap and a comb. This may be the plaintiff's belief, but has long as he was able to purchase these items, he was not denied basic hygiene items.

The court also notes that there is no evidence before the court that the plaintiff was denied medical care during his stay and no evidence that he suffered from a mental health condition that required care during this time. The plaintiff also says he was not provided proper exercise, but has failed to demonstrate that he was not able to exercise in his cell during the times he could not go outside.

However, even if the plaintiff could prove that the living conditions at the Henry County Jail were a "denial of the minimal civilized measure of life's necessities," he has failed to demonstrate that Defendants Cady or Streight knew of any substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 834. There were no problems reported in the jail with heat, air conditioning or water during the time frame of the plaintiff's complaint. The county employee responsible for the upkeep of the jail notes there were no known problems and Defendant Streight and other jail employees were not aware of problems in their areas of the jail.

Furthermore, there is no evidence the plaintiff informed either defendant of the problems he claims he was facing with is living conditions. The plaintiff provides a general statement that the defendants were aware of his complaints and he notified each of them. However, he provides no specific instances when he talked to either administrator. In addition, although the plaintiff has provided over 100 pages of exhibits, there are no letters or grievances that indicate either individual was informed of the plaintiff's complaints about his living conditions. The only mention of any problem faced by the plaintiff is a letter dated January 3, 2007 in which the plaintiff's main complaint is he was placed on administrative lockdown. The plaintiff notes there is no heat in segregation. There is no indication who received this letter or who it was intended for. In addition, Defendant Streight has provided evidence that he did not personally escort

13

detainees to the shower or out for exercise time. This responsibility was delegated to officers and Streight believed the deputies were following his directions. Streight further states that he never received any complaints from the plaintiff.

The court also notes that the plaintiff has failed to demonstrate that Defendant Cady had any personal knowledge of his complaints. Defendant Cady has stated he was not responsible for the day-to-day operations of the jail and delegated this responsibility to his Jail Administrator. A defendant cannot be held liable under 42 USC §1983 unless the plaintiff can demonstrate that the defendant's caused or participated in the alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). Also, the mere fact that an individual was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983. *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). A supervisor cannot be held liable for the errors of his subordinates.

The plaintiff has failed to demonstrate that either defendant was deliberately indifferent to his claimed living conditions. The court will grant summary judgement as to Claim # 2 and 4.

**IT IS THEREFORE ORDERED that:**

**1) The clerk of the court is directed to strike the plaintiff's motion for summary judgement. [d/e 95]. This document is not a motion for summary judgement, but is instead a response to the pending dispositive motion filed by the defendants. The same document has also been filed as a response to the defendant's motion [d/e 94] and the court has considered the arguments raised by the plaintiff.**

**2) Defendant Cullinan and Chuyann's motion to supplement their motion for summary judgement is granted. [d/e 87]**

**3) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 85, 88]  The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**4) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)c. If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**5) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**6) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**7) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 4th day of September, 2009.

                          s\Harold A. Baker
_____
                          HAROLD A. BAKER
                 UNITED STATES DISTRICT JUDGE